**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEBRASKA**

IN RE: )   Case No.:  BK 25-80366-BSK
                                                  )
RICHARD N. BERKSHIRE,          )                CHAPTER 11
                                                  )
              Debtor.                      )
                                                  )

**CHAPTER 11 TRUSTEE'S MOTION FOR CONTEMPT, SANCTIONS, AND AN INJUNCTION**

COMES NOW Lauren Goodman, the duly appointed Chapter 11 Trustee of the estate of Richard N. Berkshire in the above-captioned case (the "Trustee"), and hereby moves the Court, pursuant to 11 U.S.C. §§ 105(a) and 362(k), for an order (i) finding the Debtor, Richard Berkshire ("Debtor") and his son, Andrew Berkshire ("Andrew") in contempt of this Court's order dated September 24, 2025 (Docket No. 204), and in violation of the automatic stay, (ii) finding the Debtor in contempt of this Court's Order dated October 29, 2025 (Docket No. 258), (iii) granting an award of sanctions against the Debtor and Andrew, and (iv) granting an injunction prohibiting the Debtor and Andrew from going within 1,000 feet of the property located at 1751 S. 87th Street, Omaha, Nebraska 68124 ("Property") or otherwise interfering with the Trustee's possession, use, and/or disposition of the Property and any other real property of the estate, without first obtaining leave of this Court. In support of this motion, the Trustee states as follows:

**Background**

1.     On April 18, 2025, the Debtor filed a voluntary Chapter 11 Petition. (Docket No. 1).

2.     The Trustee was appointed on July 10, 2025. (Docket No. 74).

**The Property**

3.       The Debtor originally intended to build the Property as a home for his son, Andrew, but the Property was not completed before the Debtor filed for bankruptcy.

4.       On August 18, 2025, the Trustee arranged with the Debtor's counsel to meet at the Property to allow the Trustee's counsel and a real-estate broker, Christie Oberto, to visit the Property. At that time, no one was living in the Property, and the Debtor (and presumably Andrew) had the keys and security codes for the Property.

**The Turnover Order**

5.       On September 17, 2025, the Trustee filed her *Motion to Compel Debtor to Turnover Possession of Certain Real Property* (Docket No. 188), seeking, among other things, an order compelling the Debtor to turn over possession of the Property to the Trustee.

6.       The Court granted the Trustee's motion by order dated September 24, 2025 (the "Turnover Order"). (Docket No. 204). In its order, the Court states:

> The motion to compel turnover of real property (Doc. #188) is granted. The debtor, and anyone in possession or control of the real and personal property at 1751 S. 87th Street, Omaha, NE 68124, and 3143 Tocoa Circle, Kissimmee, FL 34746 must deliver possession of the property to the Chapter 11 trustee (the Trustee). This includes any and all keys and key codes. The Trustee is entitled to exclusive possession of the property. The Trustee may re-key or further secured the properties. The court finds the debtor is subjecting estate real property to the claims of contractors and creditors without authority. This is based upon the statements of the debtor's counsel at the hearing, and upon the debtor's motion at Doc. #154, which states the Omaha property is now subject to a post-petition construction lien filed by the debtor's son, an insider, for $456,220. This alleged debt, if legitimate, appears to be an unauthorized claim incurred post-petition. The debt to it is not listed on any of the debtor's schedules, and relief from stay was not granted to file the lien. If the debtor, Andrew Berkshire, or any third party interferes with the Trustee's exclusive possession, without express written authorization from the trustee, the trustee is authorized to contact local law enforcement to enforce her rights of possession or to seek further relief from this court. Any action law enforcement take in response, including citation or arrest, is expressly authorized by this order.

(Docket No. 204).

7. The Turnover Order was served on Andrew on September 28, 2025, and on the matrix in this case on September 29, 2025. (Docket No. 220). The Debtor's counsel received the Turnover Order when it was entered on September 24, 2025 via CM/ECF.

**The Turnover of the Property**

8. Following the entry of the Turnover Order, the Trustee's counsel, Jay Koehn, communicated with the Debtor's counsel, James Bachman, about arranging for turnover of the keys and garage codes for the Property. On September 24, 2025, Mr. Koehn requested that the two of them meet at the Property on September 26, 2025.

9. The two ultimately met at the Property on September 29, 2025. It was at that time that the Trustee first learned that Andrew and his fiancée had moved furniture and personal belongings into the Property and were living in it, despite the fact that no certificate of occupancy had been issued for the Property and Andrew and his fiancée did not have Court approval to move into it.

10. The meeting that took place at the Property on September 29, 2025, was contentious. Andrew refused to leave the Property, and Mr. Koehn was forced to call the Omaha Police Department to help enforce the Turnover Order. Only after the police officers arrived did Andrew finally begin to comply and remove his personal property from the house.

11. While he was at the Property, Mr. Koehn entered house and took a video of the Property to document its condition. Notably, the video shows no damage to an external-facing door that goes from the basement garage to the outside.

12. Andrew did not remove all of his belongings that day. Instead, over the next week or so, the Trustee arranged times for Andrew to be let into the Property to remove more items.

For these meetings, the Trustee arranged for a security company to escort Andrew into the Property. By October 18, 2025, Andrew and his fiancée had more or less moved out.

13. Once she had exclusive possession, the Trustee examined the Property and found, among other things, that the Debtor and/or Andrew had installed numerous surveillance cameras throughout the *interior* of the Property. These cameras were still plugged in and operating, along with a modem and wireless router. Upon discovering the cameras, modem and router, the Trustee unplugged them.

14. The Trustee continued checking the Property periodically thereafter.

**Andrew's Unauthorized Actions to Shut Off Utilities to the Property**

15. On Saturday, November 8, 2025, the Trustee met a contractor at the property to commission the heater. While at the Property, the Trustee found that a padlock had been placed on the gas line. The Trustee immediately sent an email message to Andrew to inquire who put the padlock on the line. Andrew shot back a response accusing the Trustee of not paying the MUD bill.

16. The Trustee then contacted MUD and learned that Andrew had *instructed MUD on October 22, 2025, to terminate utility service* to the house. Andrew had never contacted the Trustee prior to taking this action.

**Unauthorized Installation of a Surveillance Camera**

17. On November 12, 2025, the Trustee went to the Property and observed a camera that had been newly installed on the back patio of the Property. This camera was not there on any prior visit the Trustee made to the Property. That same day, the Trustee notified Andrew by email that she was aware of the camera and that if it was his camera, she intended to file a motion for contempt with the Court.

18. The next day, the Trustee and her counsel, Michael Eversden, went to the Property to remove the camera, only to find that it had already been removed by someone other than her.

**Andrew's Trespassing Truck and Trailer**

19. In her communication to Andrew on November 12, 2025, the Trustee also demanded that Andrew remove a truck and 20-foot enclosed trailer that had been parked on the driveway since the time Andrew was living in the Property. Andrew did not respond to that request.

20. The Trustee made a further demand that the truck and trailer be removed on January 6, 2026.

21. Andrew made numerous efforts to delay the removal, including interfering with the tow company. Ultimately, Andrew did remove the truck and trailer on January 9, 2026.

**The Break-In**

22. On November 23, 2025, Mr. Koehn met a cleaning contractor at the Property to show her all that needed to be cleaned. The next day, the cleaning contractor cleaned the Property while an employee of the Trustee's law firm monitored the Property. Mr. Koehn came to the Property at the end of the day to lock all the doors. He went to every door to make sure they were locked. Notably, the small door that goes from the basement garage to the outside had no damage done to it.

23. In mid to late December, 2025, the Trustee went to the Property and noticed that someone had been inside the house. There was dirt tracked on the newly-cleaned floor in various places leading from the basement garage to the upstairs, and a number of the interior security cameras that the Trustee had previously unplugged had been plugged back into nearby wall

outlets. Neither the Trustee nor her counsel had entered from the garage area or tracked in mud, nor had they plugged in any security cameras.

24. The Trustee initially thought perhaps the Debtor had retained a garage-door opener and obtained access through the large basement garage door, so she sent an email message to Mr. Bachman on December 29, 2025, inquiring whether the Debtor still had garage-door openers and had gained access to the house.

25. The Trustee received no response, so she followed up again on December 30, 2025, and again on December 31, 2025. To date, she has received no response to these inquiries.

26. On January 2, 2026, the Trustee met with a garage-door contractor at the Property. The contractor examined the garage-door opener that was installed in the basement garage and concluded that it could not have been accessed remotely, because the system requires Wi-Fi, and there was no Wi-Fi operating at the house. The Trustee and the contractor looked around the area and found that a hole had been drilled into the smaller door next to the large garage door, right behind the door handle. The hole was concealed on the outside by a piece of metal that had been taped on the door and sloppily painted to match the door's color.

27. The smaller door is configured such that if the inside handle is pressed down, the door will unlock and open, even if it is locked on the outside. The hole that had been drilled was large enough to reach a few fingers or a tool in from the outside to press down the inside handle and unlock the door.

28. Alarmed by her finding, the Trustee took action to immediately secure the door.

29. The fact that the interior security cameras, which the Trustee had previously unplugged, were plugged back in after the break-in demonstrates that the person or persons breaking in had knowledge about the cameras and likely the ability to monitor them when they

were properly operating. The Trustee believes that the only people who would know about the interior security cameras and would have any desire or ability to monitor them would be those who had control of the house before the Trustee's possession of it, namely, the Debtor and/or Andrew. Moreover, someone previously had installed an unauthorized camera on the patio in November, which shows someone's interest in monitoring the Property and their willingness to trespass in order to do so.

30.     Furthermore, nothing valuable appears to have been stolen from the Property, so this clearly was not an instance of a random burglary.

**The IRA**

31.     On October 16, 2025, the Court entered an order finding that the Debtor's IRA itself is exempt. (Docket No. 244).

32.     On October 29, 2025, this Court held a hearing on the issue of whether withdrawals from the Debtor's IRA are exempt, and the Court held that withdrawals are not exempt indefinitely. Instead, they are exempt only if they are rolled over into another IRA within sixty days after withdrawal. (Docket No. 256, 11:20-15:10; Docket No. 258, p. 1).

33.     In its written order entered after the hearing (the "IRA Order"), the Court permits the Debtor to make certain withdrawals from his IRA but directs the Debtor as follows:

> Other than the items approved above, the debtor must inform the Chapter 11 trustee of withdrawals from the IRA at the time they are made, including the amount, proposed use, and accounts to which the withdrawn funds are deposited. Despite the exempt status of the IRA, because the funds can lose exempt status at some point after a withdrawal, the Chapter 11 trustee is entitled to information regarding the IRA from both the debtor and the IRA custodian, U.S. Bank.

(Docket No. 258, p.2).

34.     On January 8, 2026, the Trustee received statements for the Debtor's IRA from U.S. Bank for the months of October and November 2025. The October statement shows that the

Debtor withdrew $120,000 the day before the October 29 hearing. The November statement shows that the Debtor withdrew $50,000 a few days after the hearing on November 4, 2025.

35. Notwithstanding the Court's IRA Order and recent communications regarding the IRA, the Debtor has not provided the Trustee with any information about these withdrawals.

**Argument**

**I.** **The Debtor and Andrew are in Contempt of Court's Order Dated September 24, 2025.**

36. Section 105(a) of the Bankruptcy Code states:

The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a).

37. A bankruptcy court has power to conduct civil contempt proceedings and issue contempt orders under 11 U.S.C. § 105. *See In the Matter of Terrebonne Fuel and Lube, Inc.*, 108 F.3d 609, 613 (5th Cir. 1997). Section 105 "grants bankruptcy courts the power to sanction conduct abusive of the judicial process…." *In re Scrivner*, 535 F.3d 1258, 1263 (10th Cir. 2008).

38. Civil contempt requires that there be a specific and definite court order requiring or prohibiting certain conduct, that the alleged contemnors had notice of the order, and that the alleged contemnors violated the order. *See In re Van Fleet*, 461 B.R. 62 (D. Colo. 2010); *In re*

*Elder-Beerman Stores Corp.*, 197 B.R. 629 (Bankr.S.D.Ohio 1996); *In re Associated Hobby Mfrs., Inc.*, 33 B.R. 959 (Bankr. E.D. Penn. 1983).[1]

39.    The Turnover Order clearly granted the Trustee exclusive possession of the Property and prohibited any interference by the Debtor or any third party. (Docket No. 204).

40.    The Debtor and Andrew had notice of the Turnover Order, because the Trustee served it on Andrew on September 28, 2025, and on the Debtor on September 29, 2025. (Docket No. 220). Moreover, the Debtor's counsel participated in the hearing on the Trustee's *Motion to Compel the Debtor to Turnover Possession of Certain Real Property* (Docket No. 188), which is the motion that prompted the Court's Order.  (Docket No. 204). Lastly, The Debtor's counsel received the Turnover Order via CM/ECF.

41.    Andrew violated the Turnover Order by moving into the Property, refusing to leave the Property, and forcing the Trustee's counsel to obtain the assistance of the Omaha Police Department to eject him from the Property.

42.    Moreover, the Debtor and Andrew violated the Court's Turnover Order by attempting to surveille the Property by means of the interior cameras and by installing a camera on the back patio of the Property without the Trustee's knowledge or consent.

43.    Andrew also violated the Court's Turnover Order by shutting off utilities to the Property without the Trustee's knowledge or consent and by trespassing on the Property.

---

[1] In the context of a creditor's violation of a discharge injunction in bankruptcy, the U.S. Supreme Court has stated that under §§ 105 and 524, a bankruptcy court may "impose civil contempt sanctions when there is no objectively reasonable basis for concluding that the creditor's conduct might be lawful under the discharge order." *Taggart v. Lorenzen*, 587 U.S. 554 (2019). If this standard applies to the present context, there can be no doubt that the Debtor and Andrew are in contempt of court. In light of the Trustee's appointment and the Court's clear Order granting the Trustee exclusive possession of the Property, there is no objectively reasonable basis for concluding that breaking into the Property, installing an unauthorized surveillance camera, and shutting off utilities to the Property might be lawful activity under the Turnover Order.

44. The Debtor and/or Andrew further violated the Court's Turnover Order by breaking into the Property and attempting once again to surveille the Property.

45. Andrew violated the Turnover Order by leaving his truck and trailer in the driveway of the Property and refusing to remove them when the Trustee demanded that he do so.

46. As such, the Debtor and Andrew have committed numerous acts in contempt of court.

## II. The Debtor and Andrew Have Violated the Automatic Stay.

47. Section 362 of the Bankruptcy Code provides that a bankruptcy petition "operates as a stay, applicable to all entities of—***(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;***." 11 U.S.C. § 362(a)(3).

48. Andrew claims to be a creditor of the Debtor, in that he has filed a proof of claim[2] in this case for $456,240. (Claim No. 9-1). Thus, Andrew has been subject to the automatic stay since the filing of the petition in this case.

49. Upon the appointment of the Trustee, the Debtor also became subject to § 362(a)(3), because the Trustee was thereafter entitled to the possession and control of estate assets. *See In re Sayeh*, 445 B.R. 19, 28-29 (Bankr. D. Mass. 2011) ("…[U]pon appointment of a trustee, [the debtor] too became subject to that stay, at least to the extent that it prohibited him from exercising control over assets of the estate without either the Trustee's permission or leave of court.").

50. As detailed above, Andrew violated the automatic stay by moving into the Property and refusing to leave. He further violated the automatic stay by causing utilities to be

---

[2] The Trustee reserves all right to object to object to this proof of claim.

shut off to the Property and by needlessly delaying the removal of the truck and trailer from the Property.

51. The Debtor and Andrew violated the stay by attempting to surveille the Property through the interior cameras, trespassing onto the Property and installing an exterior surveillance camera, and breaking into the Property and again trying to surveille the Property through the interior cameras.

52. The Debtor and Andrew have shown a pattern of willful interference with the Trustee in carrying out her duties, of which the episodes recounted herein are merely a part. The facts recounted above demonstrate a willful disregard of the automatic stay.

53. Section 362(k) authorizes the Court to enter an award of sanctions for willful violation: "Except as provided in paragraph (2), an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(k).

54. The Trustee is an individual for purposes of § 362(k) and may therefore recover on behalf of the estate damages, including costs and attorneys' fees and even punitive damages, due to a willful violation of the automatic stay. *See* 11 U.S.C. § 362(k); *In re Mullican*, 417 B.R. 389 (Bankr. E.D. Tex. 2008) (trustee is an individual entitled to recover under § 362(h) (which is now § 362(k))).

55. Even if, as some courts have held, the Trustee is not an individual for purposes of § 362(k), the Court may remedy a stay violation by means of § 105(a). *See In re Sayeh*, 445 B.R. 19, 27-28 (Bankr.D.Mass. 2011) ("A violation of the automatic stay, which is an injunction, may also be remedied by contempt process issued pursuant to the Court's authority under 11 U.S.C. § 105(a).").

56. The Trustee thus requests that the Court enter an award either under § 362(k) or § 105(a) of sanctions against the Debtor and Andrew, including punitive damages under § 362(k).

**III.     The Debtor is in Contempt of the Court's Order Dated October 29, 2025.**

57. The Court entered the IRA Order on October 29, 2025, giving the Debtor clear instructions on what he must do with regard to any withdrawals from his IRA that were not otherwise permitted under the IRA Order.

58. The Debtor had notice of the IRA Order, because it was served on his counsel via CM/ECF.

59. The Debtor completely failed to provide the Trustee with any information about the $120,000 withdrawal that was made on October 28, 2025, or the $50,000 withdrawal that was made on November 4, 2025.[3]

60. As such, the Debtor is in contempt of the IRA Order.

**IV.     The Trustee Requests an Injunction Preventing the Debtor and Andrew from Coming Near the Property or Otherwise Interfering with the Trustee's Use, Possession, or Sale of the Property or Any Other Real Property of the Estate.**

61. As stated above, Section 105(a) of the Bankruptcy Code authorizes a court to issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [title 11]." 11 U.S.C. § 105(a). The court may also "take any action…necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." *Id.*

62. "The issuance of an injunction under 11 U.S.C. § 105(a) is appropriate to protect the assets of the debtor's estate." *In re Alexander*, 289 B.R. 711 (8th Cir. BAP 2003).

---

[3] If *Taggart v. Lorenzen* applies to this context, then there is no objectively reasonable basis for concluding that the Debtor's complete failure to disclose any information about $170,000 of withdrawals is permitted under the IRA Order.

63. The scope of this authority extends beyond just the Debtor to include insiders and their agents. *See In re Allnutt*, 220 B.R. 871 (Bankr.D.Md. 1998) (finding that court has authority to enjoin debtors, insiders, and their agents from attacking sales of estate property in state courts, to prevent a debtor from regaining title to estate property by circumventing the bankruptcy process, to enforce the court's valid orders, and to prevent the debtor and his agents from injuring third parties by misconduct that is both fraudulent and vexatious).

64. The Trustee is in the process of marketing the Property for sale and will be seeking the Court's approval at the appropriate time. Interference from the Debtor and Andrew in the Trustee's use and possession of the Property is hindering and will hinder the Trustee's ability to obtain the highest and best offer for the Property, because no one will want to buy a house that is subject to break-ins and trespassing.

65. The Trustee therefore requests that, in addition to the other remedies requested herein, the Court enjoin the Debtor and Andrew from coming within 1,000 feet of the Property and from otherwise interfering in any way with the Trustee's efforts to sell real property belonging to the Debtor's estate.

66. Furthermore, the Trustee requests that the Court order that any violations of the injunction be subject to a per-occurrence penalty of an amount sufficient to deter violations.

**V. The Trustee Requests an Evidentiary Hearing**

67. The Trustee requests that the Court set this matter for an evidentiary hearing with live testimony.

WHEREFORE, the Trustee respectfully requests the Court enter an Order (i) finding the Debtor and Andrew in contempt of this Court's order dated September 24, 2025 (Docket No.

13

204), and in violation of the automatic stay, (ii) finding the Debtor in contempt of this Court's Order dated October 29, 2025 (Docket No. 258), (iii) granting an award of sanctions against the Debtor and Andrew, and (iv) granting an injunction prohibiting the Debtor and Andrew from going within 1,000 feet of the Property or otherwise interfering with the Trustee's possession, use, and/or disposition of the Property, without first obtaining leave of this Court, and setting a per-occurrence penalty for violations of the injunction in an amount sufficient to deter violations, and (v) such other and further relief as the Court may deem just and proper.

DATED this 9th day of January 2026.

**LAUREN GOODMAN, Chapter 11 Trustee,**

By: *s/ Michael T. Eversden*
    Michael Eversden NE #21941
    Jay D. Koehn NE #25784
    McGrath North Mullin & Kratz, PC LLO
    Suite 3700, First National Tower
    1601 Dodge Street
    Omaha, Nebraska 68102-1627
    Telephone: 402-341-3070
    Facsimile: (402) 341-0216
    meversden@mgrathnorth.com
    jkoehn@mcgrathnorth.com

**<u>9013-1 NOTICE OF RESISTANCE DEADLINE</u>**

To all parties in interest:

Please take notice that the Chapter 11 Trustee of the estate of Richard N. Berkshire has filed her *Motion for Contempt, Sanctions, and an Injunction* pursuant to 11 U.S.C. §§ 105(a) and 362(k). Any objection, resistance or request for a hearing regarding said Motion must be filed and served upon the undersigned on or before January 30, 2026. If no resistance or request for a hearing is timely filed, the Motion may be approved by the Court without further notice of hearing. If a timely resistance or request for hearing is filed and served, the Clerk of the Bankruptcy Court will schedule a hearing thereon pursuant to Neb. R. Bankr. Proc. 9013.

Dated this 9th day of January, 2026.

*s/ Michael T. Eversden*
Michael T. Eversden

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on January 9, 2026, I caused filing of the foregoing with the Clerk of the Bankruptcy Court using the CM/ECF system, which sent notification upon all CM/ECF participants. A copy was also served via first class U.S. mail, postage-prepaid, to the following:

Andrew R. Berkshire
3110 North 186th Court #103
Omaha, NE 68022

*s/ Michael T. Eversden*
Michael T. Eversden